**Affirmed as Modified and Memorandum Opinion filed December 18, 2018.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-18-00588-CV

---

## IN THE INTEREST OF V.L.F., V.L.F., AND V.L.F., CHILDREN

---

**On Appeal from the County Court at Law
Washington County, Texas
Trial Court Cause No. CCL8655**

---

## M E M O R A N D U M   O P I N I O N

Appellant J.M.F. ("Father") appeals the trial court's final decree terminating his parental rights and appointing the Department of Family and Protective Services as sole managing conservator of his children V.L.F. ("Violet"), V.L.F. ("Vanessa"), and V.L.F. ("Victor").[1]  The jury found clear and convincing evidence to support termination of Father's parental rights on predicate grounds of endangerment, failure

---

[1] Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minors and other individuals involved in this case.

to support, constructive abandonment, failure to complete a family service plan, and use of a controlled substance in a manner that endangered the health and safety of the children. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (F), (N), (O), and (P). The jury further found that termination of Father's rights was in the children's best interest. In a single issue Father challenges the legal sufficiency of the evidence to support the jury's findings on the predicate grounds of endangerment, failure to support, failure to comply with a family service plan and use of a controlled substance in a manner that endangered the health and safety of the children. Because we conclude the evidence is legally sufficient to support the jury's findings, we modify the judgment as noted below and affirm the judgment as modified.[2]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Pretrial Proceedings

#### 1.    Pretrial Removal Affidavit

On October 20, 2016 the Department received a report alleging neglectful supervision and physical neglect of all three children by their parents. It was reported that a Jersey Village police officer responded to a suspicious vehicle call because a car had been parked in the parking lot of a service station for at least an hour. It was reported that both parents were passed out in the car, and the three children were asleep in the car as well. When the officer directed his flashlight into the car Father tried to start the car, but the officer reached in and secured the car keys. Father also grabbed a blunt weapon from the floor board and tried to assault the police officer with it. The officer saw ashes on Father's chest, marijuana cigarette butts on the console of the car, and the officer reported the car smelled of

---

[2] The trial court also terminated the parental rights of the children's mother, M.R.G., who has not appealed.

marijuana leading to the conclusion that marijuana had been consumed in the car while the children were present. The officer reported that all three children were filthy and did not have shoes on their feet. All three children appeared sick with a stomach flu and Violet was running a fever. The inside of the car was covered with "a quarter inch thick layer of trash, old food, and debris." There were also roaches inside the car. The parents explained that they were having car trouble and had to pull over. Law enforcement officers had earlier been involved with Mother for assault and theft, and with Father for larceny, more than one count of operating a vehicle while intoxicated, malicious destruction of personal property, phone threats, assault, and more than one domestic violence charge.

The Jersey Village police officer contacted a Department caseworker and advised that both parents were arrested for possession, child endangerment, and assault on a peace officer. The officer reported that Father showed no concern for his children after booking. The children were released to F.T. ("Floyd") and their maternal grandmother ("Grandmother") with whom the parents were staying.

From October 20, 2016, the date of referral through July 13, 2017, the date of the removal, the children were placed with several family members who were unable to protect the children. Finding the children were at continued risk of harm the Department removed the children and sought temporary managing conservatorship.

### 2. Family Service Plan

Following removal, the trial court signed a temporary order appointing the Department as the children's temporary managing conservator and ordering both parents to comply with a family service plan. The order explained that the parents' failure to comply with the court's orders could result in restriction or termination of their parental rights.

3

The family service plan required both parents to:

- obtain and maintain a safe and stable home environment;
- obtain and maintain a stable and legitimate income;
- follow their probation requirements;
- submit to random drug tests to be completed within 24 hours of request, if not completed within 24 hours the tests would be counted as a positive result;
- contact the Department caseworker at least twice a month including once per month face-to-face;
- complete a drug and alcohol assessment and follow recommendations;
- live a "criminal free lifestyle and take care of pending charges";
- attend supervised visits with the children as approved by the Department;
- attend individual counseling and follow recommendations; and
- sign releases of information with service providers to allow the Department to access information with service providers.

## B.    Trial Testimony

The children came to the attention of the Department when Officer Jason Boughter of the Jersey Village Police Department received a call about a suspicious car parked near a service station. The call was placed by the service station attendant at approximately 5:15 in the morning of October 20, 2016. When Boughter arrived at the station he saw that the car was parked "in the middle of the parking lot," not near the gas pumps or in a designated parking space.

When Boughter approached the driver of the car, later identified as Father, Boughter saw Father sit up and reach for something between his legs. Boughter ordered Father to keep his hands visible and release what he was holding. Boughter identified the item as a long "metal ratchet," which Boughter described as a

4

"medium-sized, heavy automotive tool." Boughter ordered Father again to put down the tool but Father tried to start the car. Boughter reached into the car, removed the keys, and ordered Father out of the car. Boughter placed Father and Mother in handcuffs and separated them from the car.

Boughter looked inside the car and saw three children asleep. Two were in the back seat, and the third child was in the cargo area of the SUV. Boughter testified that the car smelled of freshly smoked burnt marijuana. As to the car's interior Boughter testified:

> The interior of the vehicle—I noted in my offense report, but the interior of the vehicle was as dirty as most, you know, steel dumpsters you would find outside any restaurant or business. There were roaches crawling around in it, old food wrappers and spoiled food and beer cans. It was, huh, literally sticky to the touch, like, almost the entire vehicle.

The youngest child, an infant, was in a car seat. There was only one other car seat in the car, which was a booster seat.

Boughter detained Father and Mother because they were intoxicated. Although the car "wasn't in any condition at all for children," Boughter did not wake the children while he conducted the investigation. Boughter took photographs of the interior of the car and made arrangements for Grandmother to pick up the children. Mother and Father were charged with child endangerment and taken into custody.

Photographs taken by Boughter at the scene were admitted into evidence. The photographs confirmed Boughter's description of the interior of the car. One photograph showed one of the children who Boughter described as having a black eye and a cut in addition to bruises on her arm. Boughter found cigarette butts in the car, which he submitted to the Harris County forensic lab for analysis. Lab analysis revealed the cigarette butts contained synthetic marijuana.

Madison Gressett, the Department investigator, testified that she was initially

5

contacted in October 2016 after the parents were arrested. The Jersey Village police released the children to their Grandmother and Floyd. By the time Gressett located the children they were with Mother's sister ("Aunt"). Another report was made to the Department while the children were staying with Aunt. One of Aunt's children was found outside in the street by a passer-by. Law enforcement responded to the report.

When Gressett arrived at Aunt's home to address the new referral Mother and Father were in the home supervising their children, despite the earlier removal. Gressett also observed adults consuming alcohol in front of the children. The consumption of alcohol and the child found in the street violated the safety placement instituted by the Department. Gressett explained that a safety placement is a voluntary agreement between a parent and the Department to have the children temporarily live with an individual of the parent's choosing who passes Department and criminal history background checks. After removing the children from Aunt's home, they were moved to the home of T.S. ("Terry"), a person considered by the Department as fictive kin. The children were placed with Terry on October 28, 2016, eight days after the parents' arrest by Jersey Village police. Once the children were placed with Terry, both parents were instructed that they would not live in the home with the children or stay overnight. The parents were also instructed that they could not visit the children unsupervised.

In December 2016 the children had to be removed from Terry's home because Terry allowed Mother unsupervised visitation with the children. Mother was arrested at Terry's home for public intoxication and "starting fights with an unknown person." At the same time Terry allowed the children to move back with their parents. Terry reported that she allowed the children to move back with their parents because Terry was intimidated by Mother's behavior.

6

After the children left Terry's home they lived with their parents at Floyd's home. Floyd was known to the Department to have extensive criminal history and Department history, including losing custody of his children. Gressett interviewed the parents while they were living with Floyd. Father had begun performance of some services with the Department. Father made an appointment with the Brazos Valley Council on Alcohol and Substance Abuse ("BVCASA") for a drug and alcohol assessment. Gressett instructed both parents that they could not continue to live with Floyd. Gressett referred the parents to Faith Mission in Brenham "to get on track for getting immediate shelter for their family." Gressett instructed the parents that they could remain in Floyd's home until they could obtain housing through Faith Mission. Gressett explained that Floyd was not to be left alone with the children.

In January 2017 Faith Mission contacted Gressett and told her Mother had withdrawn the application for housing. When Gressett tried to contact the parents to find out what happened she learned that Mother was in jail. Gressett visited Mother in the Washington County jail where Mother told Gressett that Mother had been arrested because she was drinking and playing cards with her family, became angry, and engaged in a physical fight with Floyd.

Because the children were exposed to violence in Floyd's home and the parents were not seeking alternative housing, the Department moved the children to a family friend, P.M. ("Pam"). At that time Father was cooperating with the Department and was named the supervised contact between Mother and the children. If Father was at work, Pam was the designated contact. Mother was not allowed to live with the family due to the alleged criminal offense. The housing available for the family at that time was a camper trailer. Pam advised the Department that although the camper did not have electricity or water she would get those services

7

connected by the end of the day. The camper was intended to be a temporary residence while the family obtained their own residence.

Gressett met with Father in late February or early March after Pam reported that she did not want the family living in the camper anymore. Father reported that Mother would probably be in jail through March and that he was trying to find an apartment in town. Father agreed to work with Family-Based Safety Services ("FBSS") but disclosed that he had not followed the recommendations of the assessment conducted by BVCASA. Gressett explained that a referral to FBSS is the next step with the Department and that FBSS continues to refer parents to services that will help the parents comply with their service plan and any other needs the parents may have. The FBSS referral was made March 7, 2017. The FBSS worker met with the family until April 2017 at which time the family had moved back in with Floyd.

The Department then decided that a family conference was necessary to ensure that the children were safe. After several attempts to contact the family members Gressett spoke with Floyd on June 8, 2017. Floyd told Gressett that the family had moved out of his home. Gressett initiated a search for the family, which included visiting the last known places of employment for each parent and calling the last known phone numbers for each parent. Gressett and other Department employees also visited all of the family members they knew. On June 29, 2017, Mother contacted the Department and told them they were living in the camper again. Gressett tried to visit the family in the camper but the gate to the property was locked. On July 13, 2017 after Mother evaded a meeting with Gressett, Gressett again visited the property where the camper was located. Gressett obtained access to the property and learned that the family had never lived in the camper. The family left some of their possessions in the camper but never lived there.

8

In Gressett's subsequent search for the family she spoke with Floyd who gave her an address where the family was living. Gressett took law enforcement officers to assist her when she went to the address given to her by Floyd. When Gressett arrived at the address Mother, Father, and the youngest child were there. The child appeared to have lost weight and "appeared to be in a state of physical neglect." The parents denied access to the two older children. Gressett informed the parents that the Department had to remove the children because the parents were denying access to the two older children and being uncooperative and deceptive with the Department. In response, Mother refused access to the two older children and left the house with the youngest child. The Department filed a writ of attachment, which was executed by law enforcement officers. The children were eventually relinquished to the Department, which placed them into foster care.

Samantha Miller, the Department caseworker, first made contact with the family after the children's removal on July 18, 2017. Miller engaged the parents in a family conference at which Miller discussed the services that would be required of the parents in the family service plan. The parents signed a document entitled "Family Group Conference Agreement–Family Service Plan." The document noted that the Department became involved when the parents were arrested for possession, child endangerment, and assault of a police officer on October 20, 2016. The parents did not comply with the placement restrictions after the children were returned. The children were removed due to concerns about an unstable home environment and drug use by the parents. The document listed hopes and dreams for the children, family strengths and supports, family concerns, a risk and safety assessment, and service plan goals. Both parents, Miller, and the Department supervisor signed the conference agreement on August 8, 2017. The services were also recorded in a family service plan.

Following the family group conference both parents were instructed to immediately go to a drug-testing facility in Brenham and submit to a hair follicle test and a urine test. Miller explained that even though the parents had admitted recent drug use the hair follicle test could act as a benchmark against which future test results could be measured. Miller explained that this worked to the parents' benefit because if the parents stopped using drugs subsequent hair follicle tests would show the decrease. The parents did not go to the drug-testing facility that day but went the following day. When the parents arrived at the facility Father had shaved his entire body preventing the facility from conducting a hair follicle test. Both parents tested negative on the urine test; Mother tested positive on the hair follicle test.

Miller explained to the parents that the service plan was not meant to be a checklist, but a lifestyle change. The service plan was prepared for the August 22, 2017 status hearing. Neither parent appeared at the hearing. Father sent Miller a text later that afternoon stating that they had overslept. Following the status hearing, the trial court signed an order requiring compliance with the service plan.

Weekly visits were established with the children. The parents' attendance at the visits was sporadic. They missed two visits because they were stopped by law enforcement officers while driving to the visit site. The first time they were stopped Mother was arrested on outstanding warrants. The second time they were stopped Father reported that officers were searching their car.

Miller made an appointment for a psychological evaluation for both parents on September 22, 2017, the same day as a regular weekly visit. The parents did not appear for the evaluation or the visit. Later that night Father sent a text message to Miller's colleague explaining that they overslept. Miller also arranged individual counseling sessions for both parents. Out of three sessions scheduled the parents attended one. The therapist discharged the parents because they did not keep two

out of three appointments. The therapist also explained to Miller that she was unable to conduct effective therapy due to both parents' ongoing substance abuse. Both parents missed another drug test on September 26, 2017. After several missed visits with the children, the Department suspended visitation until the parents had negative drug tests. The Department then required the parents to be drug tested before each visit with the children.

On October 13, 2017 the parents appeared for a visit but were drug tested before they could see the children. The parents both tested positive for methamphetamine. On October 20, 2017, the parents again tested positive for methamphetamine and marijuana. A week later, on October 27, 2017, the parents again tested positive for methamphetamine. Each time the parents self-reported that methamphetamine and marijuana were their drugs of choice.

The next time Miller saw the parents was at the November 7, 2017 permanency hearing. Both parents tested positive for methamphetamine before the hearing. Again, the parents self-reported using that morning before coming to court. Miller noted that the parents were honest about their drug use. Mother expressed a desire to seek substance abuse treatment. Miller referred Mother to BVCASA, which would provide treatment options for Mother that did not require insurance and accepted Medicaid. Mother did not contact BVCASA or otherwise seek treatment. Father denied having a drug problem. Three days later, on November 10, 2017, both parents tested positive again. Miller contacted the parents to offer a Thanksgiving visit with the children, but the parents did not respond.

On December 20, 2017 Miller met with the parents to review their service plans and determine what had been accomplished. Miller testified that the parents had maintained contact with the Department. The parents did not maintain stable housing, provide verification of employment, and were not drug free, which also

11

caused them to miss parent-child visits.

On December 27, 2017 Violet was scheduled for surgery to remove her tonsils and adenoids. Miller contacted the parents and told them they could come to the hospital for the surgery if they were drug free. Miller agreed to meet the parents at the hospital at least one hour before surgery to drug test the parents. The parents did not come to the hospital.

From January 2018 through trial neither parent visited the children. The parents either failed to appear for scheduled visits or were not drug free when they did appear. On April 24, 2018 Miller learned that Father had been arrested for violation of his community supervision.

Miller testified that termination was in the children's best interest because they "have done a complete turnaround . . . going from very traumatized to very stable, very happy, very well-adjusted."

Jan Dupriest, the therapist who treated Violet, testified that Violet reported being hit on the head because her parents were arguing. Dupriest was unable to identify which parent hit Violet. Dupriest believed that Violet had experienced physical abuse because Violet reflected fear, presented as sad and did not want to talk about the incidents that happened when she was living with her parents.

The Child Advocates volunteer testified that at the time of trial Father continued to use drugs and did not have a home or a job.

The children's pediatrician testified that the children were not current on their immunizations when they came into the Department's care. Dr. Sumeet Sharma saw the children in October 2017 for dental care. Sharma testified that Violet, who was five years old at the time, had "extensive restorative work" performed on all of her teeth. Most of Violet's teeth had silver caps on them. Sharma also observed that

12

most of the teeth under the caps were infected. Sharma noted that it had been a very long time since the children had brushed their teeth and their permanent teeth would be affected by the neglect. Sharma referred the children to a pediatric dentist.

Mother testified that on the day before the parents were arrested in Jersey Village, they had driven from Brenham to Houston to collect some items from their old apartment in Houston and to buy the children Halloween costumes. Mother testified that when they started to drive back to Brenham after dark they had car trouble. Mother told Father to park in the service station parking lot so they could sleep in the car. Mother admitted smoking marijuana earlier in the day but said she did not smoke in front of her children. Mother spent five or six days in the Harris County Jail after the arrest. At the time of trial Mother was serving two years' community supervision on the endangerment charge. Mother described the conditions of community supervision as "stay clean, report on time, live a non-criminal lifestyle." Mother admitted she had not remained drug free.

Mother was asked if she remembered a public intoxication arrest on October 5, 2016. Mother answered that she did not remember that specific arrest, but she has "had a few public intoxications." Mother admitted a previous assault conviction and resisting arrest conviction. Between October 2016 and November 2017 Mother was arrested on four separate charges. Mother admitted that she was not allowed to see her children during most of the time while the termination case was pending because she continued to test positive for drugs.

Father testified that on the day he was arrested by Jersey Village police the family had been in Houston looking for Halloween costumes. They were stopped at the service station at 10:00 or 11:00 at night because the car "kept stalling out." Father denied smoking marijuana that day and could not explain the ashes on his chest. Father pleaded guilty to child endangerment and received two years' deferred

13

adjudication community supervision on the child endangerment charge. Father's community supervision was later revoked because he failed to report to the community supervision officer. At the time of trial Father was serving an eight-month sentence in State Jail for child endangerment.

Father admitted the car was littered with garbage including cigarette butts. When asked about the debris, including roaches in the car, Father explained that "it had been a long day" and they had not cleaned out the car.

With regard to the service plan Father admitted he understood the tasks required and he understood that failure to complete those tasks could result in termination of his parental rights. Father testified that after his children were removed he was addicted to methamphetamine but at the time of trial was "fully recovered." Father blamed the Department for his drug addiction. Father also testified that Mother's addiction would be remedied if the Department returned the children to her.

After the Department rested, Father moved for an instructed verdict on the grounds that the Department did not meet its burden on the predicate grounds and best interest. The trial court denied the motion and submitted the issues to the jury.

## C. Jury Charge and Verdict

The jury charge submitted grounds for termination under Texas Family Code sections 161.001(b)(1)(D) & (E) (endangerment), (F) (failure to support), (N) (constructive abandonment), (O) (failure to comply with the service plan), and (P) (use of a controlled substance in a manner that endangered the health or safety of the children). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (F), (N), (O), & (P).

The jury charge included the following instructions:

"Endanger" means more than a threat of metaphysical injury or the

14

possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the child actually suffer injury. Rather, "endanger" means to expose to loss or injury; to place in jeopardy or danger. The endangerment to the child's physical or emotional well-being must be a direct result of the parent's conduct. The conduct may simply jeopardize the child's physical or emotional well-being. The course of conduct must be voluntary, deliberate and conscious and includes both the parent's action and the parent's omissions or failure to act.

For the conduct to result in termination of parental rights, it is not necessary that the conduct be directed at the child. It is not necessary that the child actually suffer injury. The conduct need not be in the child's presence nor the child witness the conduct.

*****

For the parent-child relationship in this case to be terminated with respect to [J.F.], father of the children, [Violet, Vanessa] and [Victor] it must be proven by clear and convincing evidence that at least one of the following events occurred;

1.  [Father] has knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

2.  [Father] has engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;

3.  [Father] failed to support the children in accordance with the father's ability during a period of one year ending within six months of the date of the filing of the petition;

4.  [Father] constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months; the Department has made reasonable efforts to return the children to the father and the father has not regularly visited or maintained significant contact with the children and the father has demonstrated an inability to provide the

15

children with a safe environment;

5. [Father] failed to comply with the provisions of a court order that specifically established the actions necessary for the father to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Protective Services for not less than nine months as a result of the children's removal from the parent for the abuse or neglect of the children;

6. [Father] used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program; or after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

For the parent-child relationship to be terminated between [Father] and the children, it must also be proven by clear and convincing evidence that termination of the parent-child relationship would be in the best interest of the children.

Now bearing in mind the foregoing instructions and definitions, you will answer the following question:

Question No. 1B: Termination of the Parental Rights of [Father]

Should the parent-child relationship between [Father] and children, [Violet, Vanessa], and [Victor] be terminated?

Answer "Yes" or "No" as to each child:

The jury answered "yes" as to each child.

The trial court signed a decree of termination finding that Father's parental rights should be terminated based on the predicate findings under Family Code section 161.001(b)(1), and that termination of Father's rights was in the best interest of the children.

16

## II. ANALYSIS

### A. Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, No. 17-0477, ___ S.W.3d ___, 2018 WL 5304691, at *3 (Tex. Oct. 26, 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 2018 WL 5304691, at *4; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could

17

have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id*.

In a proceeding to terminate the parent-child relationship brought under section 161.001 of the Texas Family Code, the petitioner must establish, by clear and convincing evidence, one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Predicate Grounds

In a single issue, Father argues the evidence was legally insufficient to support termination under section 161.001(b)(1)(D), (E), (F), (O) and (P) of the Texas Family Code. Father does not challenge the jury's finding that termination of his parental rights was in the best interest of the children. Only one predicate finding under section 161.001 is necessary to support a judgment of termination when the fact finder also finds that termination is in the children's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We will address the jury's finding of endangerment under subsection E.

"To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a

single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id*. A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). A parent's conduct that subjects children to a life of uncertainty and instability endangers the children's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

This case began with the parents' arrest for child endangerment, possession of marijuana, and assault of a police officer. Father subsequently pleaded guilty to the child endangerment charge in exchange for deferred adjudication community supervision. Father violated the conditions of his community supervision and was sentenced to eight months in State Jail. Father was serving this sentence at the time of trial.

"[E]vidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child[ren]." *In re S.R.*, 452 S.W.3d at 360-61; *see also In re A.A.M.*, 464 S.W.3d 421, 426-27 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may support a finding of endangerment under subsection E. *In re T.M.*, No. 14-14-00948-CV, 2015 WL 1778949, at *4 (Tex. App.—Houston [14th Dist.] Apr. 16, 2015, no pet.) (mem. op.). If the imprisonment of the parent reflects a voluntary, deliberate, and conscious

course of conduct, it qualifies as conduct that endangers the child. *In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *8 (Tex. App.—Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.).

Father's guilty plea and sentence for child endangerment could have been considered by the jury to reflect a voluntary, deliberate, and conscious course of conduct that endangered the children.

Drug abuse and its effect on the ability to parent can be part of an endangering course of conduct. *In re J.O.A.*, 283 S.W.3d at 345. Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting. *Walker*, 312 S.W.3d at 617. Drug use and the imprisonments relating to it harm the physical and emotional well-being of a child. *In re A.A.M.*, 464 S.W.3d at 426.

Father was initially directed to a drug-testing facility after the first family group conference. Father was directed to report to the facility immediately but did not appear until the following day. When Father arrived at the facility he had shaved his entire body preventing a hair follicle test. Father's urine test that day was negative. Thereafter when the parents went to their weekly visits with their children they were drug tested before each visit. Miller testified that when the parents appeared for visits with their children they almost always tested positive for methamphetamine. For a period of four to five weeks, as detailed above, the parents appeared weekly but were not permitted to see the children because they tested positive. After several positive tests the parents stopped appearing for visits with the children.

Father argues that "the evidence regarding any acts of endangerment to the children consisted exclusively of [Mother]'s arrests, intoxications, and aggressive behavior." To the contrary, the record reflects sufficient evidence to support the

jury's finding that Father endangered the children by continuing to use drugs during the pendency of the termination proceeding and imprisonment for child endangerment. Reviewing all the evidence in the light most favorable to the jury's finding we hold that a reasonable fact finder could have formed a firm belief or conviction that the endangerment finding was true.

Having concluded the evidence is legally sufficient to support the jury's finding under subsection E, we need not review the sufficiency of the evidence to support the subsections D, F, N, O, and P findings. *See A.V.*, 113 S.W.3d at 362. We overrule Father's sole issue.

## C.    Modification of Order of Termination

The trial court's order of termination stated that the court found by clear and convincing evidence that termination was in the best interest of the children and Father's rights should be terminated on the predicate grounds of Texas Family Code section 161.001(b)(1)(A), (B), (C), (D), (E), (F), (G), (M), (O) and (P). The trial court made these findings despite the jury's findings that clear and convincing evidence supported termination on predicate grounds in section 161.001(b)(1)(D), (E), (F), (N), (O), and (P).

Thus, even though neither party raised the issue on appeal, we modify the order of termination by deleting the findings as to subsections A, B, C, G, and M. *See Kalyanaram v. Univ. of Texas Sys.*, 03-05-00642-CV, 2009 WL 1423920, at *7 (Tex. App.—Austin May 20, 2009, no pet.) (mem. op.) (*citing Asbury v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) ("The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court. The appellate court may act sua sponte and may have the duty to do so.").

21

### III.   CONCLUSION

The evidence is legally sufficient to support the predicate termination finding under subsection E.  Father has not challenged the jury's finding that termination was in the best interest of the children.

We modify the order of termination by deleting the findings as to subsections A, B, C, G, and M and affirm the order terminating Father's parental rights as modified.


/s/    Kevin Jewell
       Justice


Panel consists of Justices Christopher, Wise, and Jewell.